# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| LABORERS' DISTRICT COUNCIL AND CONTRACTORS' PENSION FUND OF OHIO Derivatively on Behalf of AMEDISYS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> WILLIAM F. BORNE, DALE E. REDMAN, JEFFREY D. JETER, RONALD A. LABORDE, JAKE L. NETTERVILLE, DAVID R. PITTS, PETER F. RICCHIUTI and DONALD A. WASHBURN, <br><br> Defendants, <br><br> and <br><br> AMEDISYS, INC., a Delaware corporation, <br><br> Nominal Defendant. | Civil Action No. <br><br><br><br><br><br><br><br><br> **VERIFIED DERIVATIVE COMPLAINT** <br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff, Laborers' District Council and Contractors' Pension Fund of Ohio by its attorneys, submits this Verified Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by Laborers' District Council and Contractors' Pension Fund of Ohio, a shareholder of Amedisys, Inc. ("Amedisys" or the "Company"), a Delaware corporation, on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of law, including breaches of fiduciary duties, waste of corporate assets and unjust enrichment that have caused substantial losses to Amedisys and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with the Middle District of Louisiana so as to render the exercise of jurisdiction by the courts in this District permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Amedisys occurred in this District, and

defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUMMARY OF ACTION

5.      Amedisys provides multi-state home health and hospice services to the chronic, co-morbid, and aging American population.  The patients that Amedisys provides care for are also the most vulnerable members of our society, with the typical patient being Medicare eligible, 83 years old, and taking a variety of medications for various ailments.  In its latest quarterly report on Form 10-Q filed with the Securities and Exchange Commission ("SEC") on April 27, 2010, Amedisys admits that it receives 87% of its revenue for providing services that are covered by Medicare.  As such, not only are Medicare payments crucial and material to the Company's business, but these payments effectively constitute all of Amedisys's business.

6.      From at least 2005 to the present, defendants caused or allowed Amedisys to issue numerous positive statements and file quarterly and annual reports with the SEC that described the Company's improving financial position.  These statements were false and misleading, however, because they overstated the Company's financial results and its future business prospects by concealing a fraudulent scheme perpetrated by defendants involving the very people they were charged to care for.

7.      The Company's fees are set by the Centers for Medicare & Medicaid Services ("CMS") through its home health prospective payment program ("PPS").  Under the PPS, Medicare paid Amedisys certain additional amounts when patient care reached certain benchmarks.  For example, between 2000 and 2007, Medicare provided to health care providers like Amedisys a flat fee of $2,200 for up to nine home therapy visits.  Medicare paid an additional reimbursement of $2,200 when a provider made over nine home health care visits.

8.      For at least the last five years, with the knowledge and approval of the defendants, Amedisys increased the amount of home therapy visits to trigger additional Medicare payments, ultimately increasing the Company's bottom line, even when those visits were not medically

necessary. Specifically, the Company's therapists were instructed to schedule home therapy visits to trigger extra Medicare payments by reaching the ten visit mark.

9.     Defendants operated this scheme surreptitiously until, on April 27, 2010, *The Wall Street Journal* ("*Journal*") published an article questioning whether Amedisys was improperly taking advantage of Medicaid reimbursements by increasing the number of in-home therapy visits from at least 2005 to 2007. In that article, the *Journal* quoted a former Amedisys nurse who stated that "we have to have ten visits to get paid" and that the "tenth visit was not always medically necessary." Additionally, the nurse said she was instructed by her supervisors to look through patients' files to find those who were just shy of the ten visit mark and call their assigned therapists to remind them to make the extra appointment.

10.     The revelation of defendants' scheme caused an immediate shareholder reaction and public outcry, and generated a Congressional investigation. After the publishing of the *Journal* article, the Company's stock fell $3.98, or 6.5%. Then, on May 12, 2010, the Senate Finance Committee ("Committee") began an inquiry into certain home healthcare providers' billing and operation practices, including Amedisys. The letter from the Committee to the Company sought the production of documents concerning data on therapy visits and physicians with the highest patient referrals to Amedisys, as well as copies of the Company's promotional and marketing material going back to 2006. On May 13, after a second *Journal* article reporting on the Committee's investigation, the Company's stock fell another $4.48, or 8%.

11.     Then, on June 30, 2010, Amedisys announced that it had received a notice that the SEC had launched a formal investigation of the Company, seeking the same documents that Amedisys had provided to the Committee. After this latest revelation, the Company's stock dropped another $4.64, or 10.5%. As such, since April 26, 2010, the Company's market capitalization has plummeted by over $600 million. Additionally, the Company now faces a class action suit accusing the Company and certain of its officers of securities fraud.

12.     As noted above, defendants expressly or implicitly approved of the Company's employees' participation in the fraudulent Medicare scheme. This scheme was widespread,

prevalent, continued for at least five years, and was focused on boosting the bottom line in the Company's most important line of business. Defendants have caused a tremendous amount of damage to the Company, including subjecting Amedisys to class action securities fraud lawsuits and a potential claim for violation of the False Claims Act. This could lead to the exclusion of the Company from Medicare and Medicaid programs, which would essentially put Amedisys out of business.

## PARTIES

13.     Plaintiff, the Laborers' District Council and Contractors' Pension Fund of Ohio (the "Ohio Laborers' Fund") was at all times relevant hereto a holder of Amedisys common stock, the Ohio Laborers' Fund intends to retain shares in Amedisys throughout the course of this litigation. The Ohio Laborers' Fund maintains its principal office in Westerville, Ohio.

14.     Nominal defendant Amedisys is a Delaware corporation with its principal executive offices located at 5959 S. Sherwood Forest Blvd., Baton Rouge, LA. Amedisys is named in this complaint as a nominal defendant solely in a derivative capacity.

15.     Defendant William F. Borne ("Borne"), a citizen of Louisiana, is Amedisys's Chairman of the Board and Chief Executive Officer ("CEO") and has been since he founded the Company in 1982. Borne has also served as Chief Financial Officer from 1990 to 1996 and Vice President from 1990 to 1995. Defendant Borne knowingly or recklessly failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices, made false and misleading statements to the Company's shareholders, and knowingly, recklessly, or grossly negligently approved or allowed the improper manipulations of the Company's Medicare billing practices. Amedisys paid Borne the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|------|--------|-------|--------------|----------------------------------------|------------------------|
| 2009 | $750.000 | - | $2.437.531 | $1.072.500 | $58.423 |
| 2008 | $723,077 | | $2.497,388 | $1,125,000 | $35,725 |

| | | | | | |
|---|---|---|---|---|---|
| 2007 | $664,994 | - | $2,178,120 | $714,500 | $111,407 |
| 2006 | $582,701 | $650,000 | $108,329 | - | $9,728 |

16. Defendant Dale E. Redman ("Redman"), also a citizen of Louisiana, is Amedisys's Chief Financial Officer and has been since February 2007. Defendant Redman knowingly or recklessly failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices, made false and misleading statements to the Company's shareholders, and either knowingly, recklessly, or grossly negligently approved or allowed the improper manipulations of the Company's Medicare billing practices. Amedisys paid Redman the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|
| 2009 | $411.538 | $828.768 | $455.813 | $20.765 |
| 2008 | $354,808 | $618,064 | $281,250 | $17,474 |
| 2007 | $252.692 | $321.100 | $164.850 | $14.491 |

17. Defendant Jeffrey D. Jeter ("Jeter"), also a citizen of Louisiana, is Amedisys's Chief Compliance Officer and has been since March 2004. Jeter also served as Amedisys's Vice President of Compliance/Corporate Counsel from April 2001 to March 2004. Jeter knowingly or recklessly failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices, and knowingly, recklessly, or grossly negligently approved or allowed the improper manipulations of the Company's Medicare billing practices. Amedisys paid Jeter the following compensation as an executive:

| Year | Salary | Stock Awards | Option Award | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|
| 2009 | $201,923 | $136,507 | - | $150,150 | $6,945 |
| 2008 | $173,269 | $169,358 | $19,393 | $135,000 | $9,150 |
| 2007 | $159,904 | $93,014 | | $85,173 | $10,661 |
| 2006 | $124,935 | | | | $5,622 |

18.     Defendant Ronald A. LaBorde ("LaBorde"), also a citizen of Louisiana, is Amedisys's Lead Director, a position he has held since February 2003, and has served as a director since 1997.  LaBorde is also a member of the Audit Committee and has been since at least May 2005.  Defendant LaBorde knowingly or recklessly failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices, and reviewed and approved false and misleading public statements to Amedisys's shareholders.  Further, LaBorde either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices.  Amedisys paid LaBorde the following compensation as a director:

| Fiscal | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $100,500 | $124,999 | $225,499 |
| 2008 | $114,250 | $79,013 | $193,263 |
| 2007 | $55,500 | $84,152 | $139,652 |
| 2006 | $63,000 | $58,723 | $121,723 |

19.     Defendant Jake L. Netterville ("Netterville"), also a citizen of Louisiana, is an Amedisys director and has been since 1997.  Netterville is Chairman of the Audit Committee and has been since February 2003.  Defendant Netterville knowingly or recklessly failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices, and reviewed and approved false and misleading public statements to Amedisys's shareholders.  Further, Netterville either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices.  Amedisys paid Netterville the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $97,500 | $124,999 | $222,499 |
| 2008 | $115,250 | $79,013 | $194,263 |
| 2007 | $55,500 | $84,152 | $139,652 |
| 2006 | $63,500 | $58,723 | $122,223 |

20.     Defendant David R. Pitts ("Pitts"), also a citizen of Louisiana, is an Amedisys director and has been since 1997. Pitts is a member of the Audit Committee and has been since at least May 2005. Defendant Pitts knowingly or recklessly failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices, and reviewed and approved false and misleading public statements to Amedisys's shareholders. Further, Pitts either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices. Amedisys paid Pitts the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $92.250 | $124.999 | $217.249 |
| 2008 | $107.250 | $79.013 | $186.263 |
| 2007 | $42.000 | $84.152 | $126.152 |
| 2006 | $50,000 | $58,723 | $108,723 |

21.     Defendant Peter F. Ricchiuti ("Ricchiuti"), also a citizen of Louisiana, is an Amedisys director and has been since 1997. Ricchiuti is a member of the Audit Committee and has been since at least May 2005. Defendant Ricchiuti knowingly or recklessly failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices, and reviewed and approved false and misleading public statements to Amedisys's shareholders. Further, Ricchiuti either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices. Amedisys paid Ricchiuti the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $84,000 | $124,999 | $208,999 |
| 2008 | $82,250 | $79,013 | $161,263 |
| 2007 | $43,500 | $84,152 | $127,652 |
| 2006 | $51,500 | $58,723 | $110,223 |

22.     Defendant Donald A. Washburn ("Washburn"), a citizen of Oregon, is an Amedisys director and has been since 2004.  Washburn is a member of the Audit Committee and has been since at least May 2005.  Defendant Washburn knowingly or recklessly failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices, and reviewed and approved false and misleading public statements to Amedisys's shareholders.  Further, Washburn either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices.  Amedisys paid Washburn the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2009 | $83,250 | $124,999 | $208,249 |
| 2008 | $97,750 | $79,013 | $176,763 |
| 2007 | $43,000 | $84,162 | $127,152 |
| 2006 | $52,000 | $58,723 | $110,723 |

23.     The defendants identified in ¶¶15 and 18-22 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶15-17 are referred to herein as the "Officer Defendants."  Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

24.     By reason of their positions as officers, directors and/or fiduciaries of Amedisys and because of their ability to control the Company's business and corporate affairs, the Individual Defendants owed Amedisys and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Amedisys and its shareholders

so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

25.     Each director and officer of the Company owes to Amedisys and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

26.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Amedisys, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Amedisys, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of the Company.

27.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Amedisys, and was at all times acting within the course and scope of such agency.

28.     To discharge their duties, the officers and directors of Amedisys were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Amedisys were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how Amedisys conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

29.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Amedisys, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

30.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of federal securities laws.  As a result, Amedisys has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    Costs incurred in responding to investigations propounded by governmental authorities and agencies;

(b)    Costs incurred to carry out internal investigations, including legal fees owed and paid to outside counsel; and

(c)    Costs incurred in investigating and defending Amedisys and certain officers in the class action, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

31.    Moreover, these actions have also irreparably damaged Amedisys's corporate image and goodwill.  For at least the foreseeable future, Amedisys will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Amedisys's ability to raise equity capital or debt on favorable terms in the future is most likely now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

32.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

33.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was engaging in a fraudulent Medicare scheme to manipulate the number of home visits made to patients with the goal of maximizing its revenue; (ii) maintain the Individual Defendants' executive and directorial positions at Amedisys and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Amedisys, regarding the Individual Defendants' management of the Company's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

34.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during which they caused the Company to conceal the true fact that Amedisys was misrepresenting its financial results.  In addition, defendants also made other specific, false statements about Amedisys's financial performance and future business prospects, as alleged herein.

35.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

36.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully or recklessly misrepresent its financial results.  Because the actions described herein occurred under the authority of the Amedisys Board of Directors, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

37.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### *Background*

38.     Under the False Claims Act ("FCA"), knowingly presenting or causing to be presented to the United States any false of fraudulent claim for payment is a violation of federal law.  "Knowingly" includes making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the government.  "Claim" includes any request or demand, whether under contract or otherwise, for money or property which is made to a contractor grantee or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.  If there is a violation of the FCA, the United States may recover three times the amount of the damage the government sustained and a civil monetary penalty.

39.     In addition, and even more importantly here, a violation of the FCA can subject the perpetrator to exclusion from participation in federal health care programs.  Such exclusion would result in catastrophic damages to Amedisys and its shareholders because Medicaid and Medicare would no longer cover the costs of a visit from an Amedisys employee, thereby devastating the Company's main source of revenue.  By engaging in the fraudulent scheme described herein, the Individual Defendants put the Company at risk of violating the FCA, and thus, being excluded from Medicare payments.

40.     This is not Amedisys's first encounter with potential violations of the FCA.   In 2003, the Company entered into a Corporate Integrity Agreement with the Office of the Inspector General of the Department of Health and Human Services concerning FCA violations by the Company from 1994 to 1999 (the "2003 CIA").   During that time period, the Company billed Medicare for services that were not rendered and submitted invalid cost report deductions. The Company's employees altered records, falsified physician/patient signatures, and falsified nurse's notes in order to bill for services that never occurred.

41.     The 2003 CIA mandated that the Company create a position for a Corporate Compliance Officer and a compliance committee.   The 2003 CIA also required that the Company maintain its written standards of conduct.   In connection with these violations, Amedisys agreed to pay the United State Department of Justice $1.156 million.

42.     On October 1, 2008, the Company acquired Home Health Corporation of America ("HCA").   HCA had also entered into a Corporate Integrity Agreement in 2005 (the "2005 CIA") to resolve claims out of an illegal kickback scheme.   Though the wrongdoing at HCA occurred before the Amedisys acquired it, the provisions of the 2005 CIA are still binding on Amedisys. The 2005 CIA required that the Compliance Officer make periodic reports regarding compliance matters directly to the Board, and is authorized to report to the Board at any time any noncompliance.   The 2005 CIA has stipulated penalties for non-compliance, including the possibility of exclusion from Medicare.

### *Defendants' Fraudulent Scheme*

43.     As noted above, from 2000 to 2007, the Company's fees were set by CMS through its PPS program.   Under this program, Medicare paid Amedisys certain additional amounts when patient care reached certain benchmarks.   For example, during this time, Medicare provided to

health care providers like Amedisys a flat fee of $2,200 for up to nine home therapy visits. Medicare paid an additional reimbursement of $2,200 when a provider made over 9 home health care visits. Since January 2008, CMS eliminated the $2,200 additional payment at 10 visits and now provides additional payments at six, fourteen and twenty therapy visits.

44. Before 2008, the Company provided many of its patients just enough home therapy visits to trigger the extra $2,200 payment. The statistics cited by the *Journal* in this regard are telling, as its analysis of visits in 2007 showed that "28.5% of the patients who received therapy got 10 to 12 visits, thereby triggering the extra $2,200 Medicare payment." As the *Journal* also noted, "[s]uch cases are highly profitable because they cost the company less than $80 per visit." Meanwhile, in 2008, after CMS changed its reimbursement rules, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that received six, fourteen and twenty visits increased by 8%, 33% and 41%, respectively.

### Defendants' False and Misleading Statements

45. On February 23, 2010, defendants caused Amedisys to issue a press release announcing the Company's financial results for the fourth quarter and year ended December 31, 2009. The Company reported net service revenue of $405.5 million compared to $340.1 million for the fourth quarter of 2008. The Company further reported net income of $37.8 million, or $1.35 diluted earnings per share for the quarter, compared to $26.3 million, or $0.97 diluted earnings per share in the same period the prior year. For the year, the Company reported net service revenue of $1.5 billion, compared to $1.2 billion in 2008. The Company further reported net income of $135.8 million for 2009, compared to $86.7 million in 2008. In the press release, Defendant Borne touted the Company's continued growth, stating: "We had outstanding results for the fourth quarter and full year ending 2009. This marks the seventh consecutive year in

which we have increased our earnings per share in excess of 20%."

46.     On February 23, 2010, defendants also caused the Company to file its Annual Report on Form 10-K for the fourth quarter and year ended December 31, 2009 (the "2009 10-K"), which was signed by defendants Borne, Redman, Netterville, Pitts, Ricchiuti, LaBorde, and Washburn.  Defendants Borne and Redman signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the fact that the Form 10-K "did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

47.     The Company's 2009 10-K acknowledged that it received the majority of its revenue from Medicare, and stated that the Company must comply with the "conditions of participation" including compliance with state and local laws and regulations.  Specifically, the 2009 10-K provided:

> Medicare Participation
>
> As we expect to continue to receive the majority of our revenue from serving Medicare beneficiaries, our agencies must comply with regulations promulgated by the United States Department of Health and Human Services in order to participate in the Medicare program and receive Medicare payments. Among other things, these regulations, known as "conditions of participation," relate to the type of facility, its personnel and its standards of medical care, as well as its compliance with state and local laws and regulations.

48.     The Company's 2009 10-K also touted Amedisys's supposed "controls" over its business system infrastructure.  Specifically, it stated:

> **Controls over Our Business System Infrastructure**
>
> We establish and maintain processes and controls over coding, clinical operations, billing, patient recertifications and compliance to help monitor and promote compliance with Medicare requirements.

*     *     *

- **Billing**— We maintain controls over our billing processes to help promote accurate and complete billing. In order to promote the accuracy and completeness of our billing, we have annual billing compliance testing; use formalized billing attestations; limit access to billing systems; use risk forecasting methodologies; perform direct line supervisor audits; hold weekly operational meetings; use automated daily billing operational indicators; and take prompt corrective action with employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized "Zero Tolerance Policy".

- **Patient Recertification**— In order to be recertified for an additional episode of care, a patient must be diagnosed with a continuing medical need. This could take the form of a continuing skilled clinical need or could be caused by changes to the patient's medical regimen or by modified care protocols within the episode of care. As with the initial episode of care, a recertification requires approval of the patient's physician. Before any employee recommends recertification to a physician, we conduct an agency level, multidisciplinary care team conference. We also monitor centralized automated compliance recertification metrics to identify, monitor, and where appropriate audit, agencies that have relatively high recertification levels.

- **Compliance**— The quality and reputation of our personnel and operations are critical to our success. We develop, implement and maintain ethics, compliance and quality improvement programs as a component of the centralized corporate services provided to our home health and hospice agencies. Our ethics and compliance program includes a Code of Ethical Business Conduct for our employees, officers, directors and affiliates and a process for reporting regulatory or ethical concerns to our Chief Compliance Officer through a confidential hotline. We promote a culture of compliance within our company through persistent messages from our senior leadership concerning the necessity of strict compliance with legal requirements and company policies and procedures, and through publicizing and enforcing our Zero Tolerance Policy. We also employ a comprehensive compliance training program that includes: annual compliance testing; new hire compliance training; new acquisition compliance training; sales compliance training; new employee orientation compliance training; billing compliance training; and compliance presentations at all company functions.

49.     On April 27, 2010, defendants caused the Company to issue a press release announcing its financial results for the quarter ended March 31, 2010. The Company reported net service revenue of S413 million compared to $341.8 million in the first quarter of 2009. The Company also reported net income of $36.6 million, or $1.29 diluted earnings per share for the first quarter 2010, compared to $27 million or $0.99 diluted earnings per share a year earlier.

50.     On the same day, defendants caused the Company to file its quarterly report on Form 10-Q for the quarter ended March 31, 2010 with the SEC, which was signed by defendant Redman.  The Form 10-Q reiterated the previously announced financial statements.  In addition, pursuant to the SOX, the Form 10-Q contained signed certifications by defendants Borne and Redman, once again stating that the Form 10-Q "did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

## *The Truth Is Revealed*

51.     On April 27, 2010, the *Journal* published an article questioning whether Amedisys was improperly taking advantage of the Medicare reimbursement system by increasing the number of in-home therapy visits, even when those visits were not medically necessary.  The article stated, in relevant part:

> Medicare reimbursements are determined in part by the number of at-home therapy visits each patient receives, with an extra fee kicking in as soon as a patient hits a certain number of visits. Between 2000 and 2007, Medicare paid companies a flat fee of about $2,200 for up to nine home therapy visits. It paid an additional reimbursement of roughly $2,200 if the therapy surpassed nine visits. That incentive was designed so that agencies didn't "stint" on therapy visits, says Laurence Wilson, the director of chronic-care policy group at the Centers for Medicare and Medicaid Services, the agency that runs Medicare.

> According to The Journal analysis, which was based on publicly available Medicare records, Amedisys provided many of its patients just enough therapy visits to trigger the extra $2,200 payment. In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more. In 2007, for instance, only 2.88% of patients got nine visits, while 9.53% of patients got 10 visits.

> "I was told 'we have to have ten visits to get paid,'" says Tracy Trusler, a former Amedisys nurse for two years in Tennessee, who has since left the company. Her supervisors, she says, asked her to look through patients' files to find those who were just shy of the 10-visit mark and call their assigned therapists to remind them to make the extra appointment.

"The tenth visit was not always medically necessary," Ms. Trusler says.

*     *     *

The number of visits eligible for the extra reimbursement has a significant impact on home-health providers' receipts from Medicare and thus on overall revenue. While Amedisys doesn't break out the amount of revenue from the extra Medicare payment, the company says between 55% and 60% of its patients receive home therapy. In 2007, according The Journal's analysis, 28.5% of the patients who received therapy got 10 to 12 visits, thereby triggering the extra $2,200 Medicare payment. Such cases are highly profitable because they cost the company less than $80 per visit.

Medicare reimbursements for the entire home health-care industry are coming under increased scrutiny. The federal agency that advises Congress on Medicare payment issues, the Medicare Payment Advisory Commission, or MedPAC, warned last month that home health "overpayments contribute to the insolvency" of the Medicare trust fund as well as premium increases that beneficiaries must pay.

Medicare changed its reimbursement rules in January 2008 in an attempt to blunt the incentive for home health-care visits it created. It eliminated the $2,200 bonus payment at 10 visits and now pays an extra fee of a couple of hundred dollars at six, 14 and 20 therapy visits. "What we felt we could do is try to create some better incentives in the system for providing the level of service that beneficiaries actually needed," says Mr. Wilson from Medicare.

It wasn't until the change was made that MedPAC noticed the questionable home visit patterns. In its March report, the agency said that the industry-wide percentage of therapy visits in the 10-to-13 range dropped by about a third after the policy change in 2008.

The pattern of clustered visits around reimbursement targets is continuing: MedPAC found the number of therapy visits numbering six, 14 and 20 increased after the policy was changed in 2008.

During a MedPAC meeting in December, Arnold Milstein, a MedPAC commissioner, questioned whether all the home visits were appropriate. "Looking at the great speed with which the volume of services adapts to payment changes, which are breathtaking, it does suggest that there may be a problem with certifying the appropriateness of these services," Mr. Milstein said, according to a transcript of the meeting.

Based on the report, MedPAC suggested for the first time last month that the Secretary of Health and Human Services "review home health agencies that exhibit unusual patterns of claims for payment."

The Journal analysis found a similar pattern: In 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that got six visits increased 8%. The percentage of patients getting 14 visits rose 33% and the percentage getting 20 visits increased 41%.

\*       \*       \*

In 2000, Medicare rolled out its new reimbursement system. It began paying a flat sum of about $2,200 for a 60-day period of care, no matter how many times a nurse went to a patient's home. The fee also included up to nine visits from occupational, physical or speech therapists. Doctors need to sign off on the number of visits in order for the company to be reimbursed

Through 2007, an agency would receive the additional $2,200 if it sent a therapist to a patient's home 10 or more times during the same period

The generous Medicare reimbursements are one reason the home health-care industry has grown so swiftly, according to MedPAC. There are now more than 10,400 home-health agencies in the U.S., up nearly 50% since 2002

After the new reimbursement system was implemented in 2000, Amedisys's fortunes improved markedly. Its profits rose and its stock soared. Today, Amedisys has a market value of $1.7 billion.

52.     After the publishing of the *Journal* article, the Company's stock fell $3.98, or 6.5%.

53.     The Senate Finance Committee then started an investigation into Amedisys's billing and operating practices.  In a letter to Amedisys dated May 12, 2010, the Committee cited to the article and questioned whether Amedisys "intentionally increased utilization for the purpose of triggering higher reimbursements."  The letter stated that the findings reported in the article suggests that Amedisys is "basing the number of therapy visits they provide on how much Medicare will pay them instead of what is in the best interests of patients."  Moreover, the Committee's letter noted that when Medicare changed its payment rules in 2008 to provide additional reimbursement to patients when they had six, fourteen and twenty therapy visits,

Amedisys apparently changed their utilization patterns as a result of these payment policy changes."  In addition, the Committee noted that the physician referral form associated with Amedisys's Balanced for Life program "raises concerns that the program may be taking advantage of Medicare payments in order to improve company profits."  The Committee also questioned marketing materials that aim to target seniors "to take advantage of payments to improve profits."  Accordingly, the Committee requested that Amedisys produce a variety of documents.

54.     The next day, the *Journal* reported that the Committee had launched an investigation into the practices of Amedisys and whether the Company has "deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements."  The article stated,  in relevant part:

> Companies "working with Medicare should not be allowed to target seniors or manipulate care simply to get higher reimbursement rates," said Sen. Max Baucus (D., Mont.), chairman of the finance committee, in a statement.
>
> "It appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both," said Sen. Charles Grassley, (R., Iowa), ranking member of the committee. "We're working to figure out what's going on."
>
> *     *     *
>
> The senators asked Amedisys to also provide information on its falls-prevention program called "Balanced for Life."
>
> More than 330 Amedisys locations offer "Balanced for Life" -- for which Amedisys has told investors that it receives an extra $1,000 to $2,000 per patient – up from 33 locations in 2008.

55.     After this second *Journal* article reporting on the Committee's investigation, the Company's stock fell another $4.48, or 8%.

56.     Then, on June 30, 2010, Amedisys announced that it had received a notice that the SEC had launched a formal investigation of the Company, seeking the same documents that

Amedisys had provided to the Committee. After this latest revelation, the Company's stock dropped another $4.64, or 10.5%.

57.     The statements referenced above were each materially false and misleading when made because they failed to disclose the following non-public, material and adverse facts, among others: (a) that the Company's sales and earnings growth numbers were materially impacted by the Company's fraudulent scheme to increase its billing and, thus, its Medicare revenue; (b) that the Company lacked adequate internal controls and was therefore unable to ascertain its true financial condition; and (c) that as a result of the foregoing, the Company's positive financial results were materially overstated at all relevant times.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

58.     Plaintiff brings this action derivatively in the right and for the benefit of Amedisys to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Amedisys is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

59.     Plaintiff will adequately and fairly represent the interests of Amedisys in enforcing and prosecuting its rights.

60.     Plaintiff is and was an owner of the stock of Amedisys during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

*61.*     The Board of Directors of Amedisys at the time of the filing of this action consisted of the following 6 individuals: defendants Borne, LaBorde, Netterville, Pitts, Ricchiuti and Washburn. Plaintiff has not made any demand on the Board of Directors of Amedisys to institute this action because such a demand would be a futile, wasteful and useless act, and is therefore legally excused.

### *Misconduct Not a Valid Exercise of Business Judgment*

62.     The Director Defendants' challenged misconduct at the heart of this case constitutes the direct facilitation of improper and unethical conduct aimed at the crux of the Company's business, including knowingly and consciously presiding over the Company's systematic manipulations of the Company's Medicare billing practices, as well as actively covering up this misconduct through certain of the Director Defendants' participation in the issuance and dissemination of false and misleading statements and assurances. As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of applicable law. Breaking the law is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment.

63.     A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment—conduct for which the Director Defendants face potential personal liability. Simply put, violating the law, approving the violations of applicable law by others, or looking the other way while refusing to prevent others under the Board's control from violating the law are all forms of misconduct that cannot under any circumstances be examples of legitimate business conduct. The protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever constitute the "good faith" required of corporate fiduciaries.

64.     Significantly, Amedisys's dependence on Medicare for continued survival, quarterly Board meetings with its Compliance Officer, and supposed imposition of corporate integrity agreements renders it impossible for the Board to claim ignorance of its duties to ensure that the Company operates its business lawfully and ethically. The Company's Chief Executive Officer and Chairman of the Board, defendant Borne, and its Corporate Counsel, defendant Jeter, signed the 2003 CIA. Every member of the Board except Washburn was also on the Board at the

time the Company entered into the 2003 CIA. Each Board member also signed at least one of the Company's annual reports that contained misleading public statements. The Board members knew of the importance of the Company's compliance with FCA and its relationship with the regulatory agencies administering Medicare. Each Director Defendant was also on the Board in 2008 when the Company acquired HCA. Therefore, each member of the Board knew or was reckless in not knowing about the Company's requirement not to manipulate its billing practices. Defendants' fraudulent scheme became particularly apparent to insiders after the CMS changed how it provided additional payments to home health organizations in 2008, as provided in the April 27, 2010 *Journal* article referenced herein. The Board's tacit or express approval for the continued manipulation of the visits to the Company's patients in order to increase billings to Medicare cannot be regarded as a valid exercise of business judgment.

### *A Majority of the Board Faces a Substantial Likelihood of Liability*

65. Even if knowingly presiding over multiple violations of applicable law could somehow fall within the ambit of the business judgment rule (which it does not), demand is also futile and excused because a majority of the Board is not disinterested.

66. Defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn cannot impartially consider a demand because they face a substantial likelihood of liability. Amedisys is rather unique in that these five members of the Amedisys board compose the members of each of Amedisys's Audit, Compensation and Nominating and Corporate Governance Committees.

67. Because these directors are members of the Audit Committee, each was required to "oversee the accounting and financial reporting processes of the Company" and discuss "major issues as to the adequacy of the Company's internal controls." Additionally, the Audit Committee Charter for Amedisys mandates that defendants LaBorde, Netterville, Pitts, Ricchiuti,

and Washburn "discuss and review the type and presentation of information to be included in earnings press releases" and "the types of financial information and earnings guidance provided, and the types of presentations made, to analysts and rating agencies." Thus, defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn were responsible for overseeing and directly participating in the dissemination of Amedisys's improper financial statements.

68. Even worse, defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn approved the dissemination of the false and misleading press releases and financial statements filed with the SEC, including the Annual Report on Form 10-K which they signed, as alleged above. Defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn breached their fiduciary duty of loyalty by participating in the preparation and approving the release of false and misleading public statements.

69. Further, defendants Borne, LaBorde, Netterville, Pitts, and Ricchiuti have all been on the Board since 1997, and thus were on the Board when the Company first violated the FCA, the result of which was the 2003 CIA. These defendants were also on the Board when the Company bought HCA, which subjected the Company to the 2005 CIA. The fraudulent scheme set forth herein was systemic throughout the Company, lasted at least five years, and could possibly cost the Company access to its only major source of revenue. Despite the red flags alerting them to the Company's need for adequate internal controls over its billing practices and the critical importance of Medicare revenue to its overall business, these defendants either approved, or in reckless disregard of their duties, were unaware of the manipulation occurring at Amedisys concerning its billing practices through unnecessary visitations. Indeed, the only way these defendants could not have known about the fraudulent scheme was through conscious disregard of their duty of loyalty. Therefore, defendants Borne, LaBorde, Netterville, Pitts,

Ricchiuti, and Washburn face a substantial likelihood of liability.

70. Defendant Borne founded the Company and is its Chief Executive Officer and Chairman. On November 10, 2003, Borne entered into the 2003 CIA. Borne was also Chief Executive Officer of Amedisys when the Company acquired HCA. Borne also made and signed false and misleading public statements, as set forth in more detail above. Further, as part of his duties, Borne runs the daily operations of Amedisys. Therefore, he is responsible for the Company's lack of adequate internal controls and violations of applicable law. As such, Borne faces a substantial likelihood of liability, raising a reasonable doubt about whether he could impartially consider a demand.

71. The principal professional occupation of defendant Borne is his employment with Amedisys, pursuant to which he received and continues to receive substantial monetary compensations and other benefits as set forth in more detail above. Accordingly, defendant Borne lacks independence from defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn, defendants who are not disinterested and/or independent and who exert influence over defendant Borne's compensation by virtue of their positions as members of the Compensation Committee. This lack of independence renders defendant Borne incapable of impartially considering a demand to commence and vigorously prosecute this action.

72. The Director Defendants were required to act upon any information of illegality or unethical conduct to protect the Company from continued legal violations being committed in its name. Rather than doing so, the Director Defendants consciously ignored the information presented to them and about which they were otherwise made aware concerning the Company's extensive legal and ethical violations. As a result, the Director Defendants face a substantial likelihood of liability for their conduct.

73.     The Director Defendants are likewise conflicted from and unable to pursue the Company's claims against the Officer Defendants.  Any effort to directly prosecute such claims against the Officer Defendants for their direct roles in the violations of applicable law carried out in Amedisys's name would necessarily expose the Board's own culpability for the very same conduct.  In other words, given that the Board was required to be regularly informed concerning the Company's compliance or non-compliance with applicable laws, any effort by the Director Defendants to hold the Officer Defendants liable would lead the Officer Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established and by and known to the Board.

74.     The acts complained of constitute violations of the fiduciary duties owed by Amedisys's officers and directors, and these acts are incapable of ratification.

75.     Each of the Director Defendants of Amedisys authorized and/or permitted the false and misleading statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

76.     As noted above, Amedisys has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants, including the Director Defendants, have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Amedisys any part of the damages Amedisys suffered and will suffer thereby.

77.     Moreover, despite the Individual Defendants having knowledge of the claims and

causes of action raised by plaintiff, the current Board has failed to seek recovery for Amedisys for any of the wrongdoing alleged by plaintiff herein.

78.     If Amedisys's current and past officers and directors are protected against personal liability for their breaches of the fiduciary duties alleged in this complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Amedisys.  But the directors' and officers' liability insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Amedisys against these Individual Defendants, known as the "insured versus insured exclusion."  As a result, if these directors were to cause Amedisys to sue themselves or certain of the officers of Amedisys, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If no directors' and officers' liability insurance exists, then the current directors will not cause Amedisys to sue the Individual Defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

79.     Plaintiff has not made any demand on the shareholders of Amedisys to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Amedisys is a publicly held company with over 28 million shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of

28

shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I
### Derivatively on Behalf of the Company Against the Individual Defendants for Breach of Fiduciary Duty

80.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

81.    The Individual Defendants owed and owe Amedisys fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Amedisys the highest obligation of good faith, fair dealing, loyalty and due care.

82.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

83.    Each of the Individual Defendants had actual or constructive knowledge that they had authorized or caused the Company to engage in the fraudulent scheme set forth herein, and then improperly misrepresent the financial results of the Company and fail to correct the Company's publicly reported financial results. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

84.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Amedisys has sustained and will continue to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

85.    Plaintiff on behalf of Amedisys has no adequate remedy at law.

## COUNT II
### Derivatively on Behalf of the Company Against the Individual
### Defendants for Waste of Corporate Assets

86.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

87.     As a result of the misconduct as detailed herein, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Amedisys to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incurring potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

88.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

89.     Plaintiff on behalf of Amedisys has no adequate remedy at law.

## COUNT III
### Derivatively on Behalf of the Company Against the Individual
### Defendants for Unjust Enrichment

90.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

91.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Amedisys.

92.     Plaintiff, as a shareholder and representative of Amedisys, seeks restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.      For extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Amedisys has an effective remedy;

C.      Awarding to Amedisys restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

DATED: August 2, 2010

BRANSTETTER, STRANCH &
        JENNINGS, PLLC
J. Gerard Stranch, IV
Michael G. Stewart
Joe P. Leniski, Jr.
227 Second Avenue North,
4th Floor
Nashville, TN  37201
Tel: 615-254-8801
Fax: 615-250-3937
gstranch@branstetterlaw.com
mstewart@branstetterlaw.com
jleniski@branstetterlaw.com


BARRACK, RODOS & BACINE
Stephen R. Basser
Samuel M. Ward
600 West Broadway, Suite 900
San Diego, CA  92101
Telephone:  (619) 230-0800
Facsimile:  (619) 230-1874
sbasser@barrack.com
sward@barrack.com


**ROBEIN, URANN
SPENCER, PICARD & CANGEMI, APL**


**s/Julie Richard-Spencer**
Julie Richard-Spencer (LA Bar No. 20340)
2540 Severn Avenue, Suite 400 (70002)
Post Office Box 6768
Metairie, LA 70009-6768
Telephone: (504) 885-9994
Facsimile: (504) 885-9969
Email: jrichard@ruspclaw.com


F:\APPS\WP51\CLIENTS\Amedisys Inc\Pleadings\Complaint_080210.DOCX